UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

FRIEDA JOHNSTON                      CIVIL ACTION NO. 6:12-cv-02669

VERSUS                               JUDGE DOHERTY

CAROLYN W. COLVIN,                   MAGISTRATE JUDGE HANNA
COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before this Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further consideration consistent with this report and recommendation.

### BACKGROUND

The claimant, Frieda Johnston, was born on August 6, 1986.[1]  She completed

high school and two years of college.[2]  She has work experience as a telemarketer and

in retail sales.[3]  On May 13, 2010, at the age of twenty-three, she applied for

---

[1]     Rec. Doc. 4-1 at 103.

[2]     Rec. Doc. 4-1 at 30, 103.

[3]     Rec. Doc. 4-1 at 28-29.

supplemental security income payments.[4]  At the time of the hearing, she was twenty-four years old.  She is now twenty-seven.  She lives at home with her parents, does not attend school, and does not have a job.[5]  She does not do housework or laundry; she does not cook.[6]  She testified that she is usually too tired to leave the house.[7]  She visits with friends about once a month.[8]  She enjoys reading but gets headaches and has trouble concentrating.[9]

A  disability  report  filed  contemporaneously  with  her  application  for  SSI indicates that the conditions allegedly limiting her ability to work are dysautonomia and postural orthostatic tachycardia syndrome.[10]  She alleged a disability onset date of August 12, 2006.[11]

---

[4]      Rec. Doc. 4-1 at 103.

[5]      Rec. Doc. 4-1 at 28, 31.

[6]      Rec. Doc. 4-1 at 33.

[7]      Rec. Doc. 4-1 at 34.

[8]      Rec. Doc. 4-1 at 35.

[9]      Rec. Doc. 4-1 at 35.

[10]      Rec. Doc. 4-1 at 124.

[11]      Rec. Doc. 4-1 at 103.

In August 2010, a determination was made that Ms. Johnston is not disabled.[12] She requested a hearing,[13] which was held on April 28, 2011 before Administrative Law Judge ("ALJ") Lawrence T. Ragona.[14]

The ALJ issued an unfavorable ruling on August 16, 2011.[15]  Ms. Johnston requested review by the Appeals Council, but the Appeals Council denied her request.[16]  Therefore, the ALJ's ruling is the Commissioner's final decision.  In October 2012, Ms. Johnston instituted this lawsuit, seeking judicial review of the Commissioner's adverse decision.[17] Ms. Johnston now argues that the Commissioner erred in failing to find that she is disabled because of her disorders.

Ms. Johnston reported to her treating physician, Dr. Charles R. Thompson, that she first began having symptoms of dysautonomia at the age of fifteen.  At some point before March 7, 2007, she was diagnosed with this disorder and/or the associated disorder called postural orthostatic tachycardia syndrome ("POTS") by a neurologist who performed a diagnostic tilt table test.  When Ms. Johnston first saw Dr.

---

[12]     Rec. Doc. 4-1 at 56.

[13]     Rec. Doc. 4-1 at 10.

[14]     A transcript of the hearing is found in the record at Rec. Doc. 4-1 at 26-55.

[15]     Rec. Doc. 4-1 at 15-20.

[16]     Rec. Doc. 4-1 at 4.

[17]     Rec. Doc. 1.

Thompson in March 2007,[18] he reviewed her medical records, reviewed the results of the tilt table test, obtained a complete medical history, and examined Ms. Johnston. His impression was that she had dysautonomia, tachycardia, and fatigue.

Ms. Johnston saw Dr. Thompson again on May 14, 2007,[19] August 13, 2007,[20] September 24, 2007,[21] March 17, 2008,[22] October 7, 2009,[23] and on May 4, 2011.[24] In his treatment notes, Dr. Thompson recorded that Ms. Johnston was experiencing marked and extreme fatigue, marked exercise intolerance, syncope (fainting), dizziness, lightheadedness, nausea, tachycardia (rapid heartbeat), palpitations, visual changes (including graying out and tunnel vision), tremulousness, proximal muscle weakness, chest discomfort, shortness of breath, gastrointestinal problems, difficulty concentrating, joint pain, stiffness, arthritis, and muscle pain.  In October 2009, he noted that she had a very unsteady gait.

---

[18]    Rec. Doc. 4-1 at 215-217.

[19]    Rec. Doc. 4-1 at 212-214.

[20]    Rec. Doc. 4-1 at 209-211.

[21]    Rec. Doc. 4-1 at 197-199.

[22]    Rec. Doc. 4-1 at 193-195.

[23]    Rec. Doc. 4-1 at 188-190.

[24]    Rec. Doc. 4-1 at 45; Rec. Doc. 4-1 at 262-264.

On June 18, 2007, Dr. Thompson wrote a letter explaining Ms. Johnston's diagnosis, as follows:

> Ms. Johnston has been diagnosed with dysautonomia. This is an episodic disorder that causes dizziness, nausea, dramatic spikes and drops in blood pressure, tachycardia, palpitation, weakness, intolerance to extremes in heat or cold weather, exercise intolerance, and many other related problems. Virtually all of these patients experience periods of remission, then suddenly find themselves unable to function due to a severe exacerbation of their symptoms. There is no cure to this benign, but disabling, condition. Eventually, after months or usually many years, it could resolve itself. There is simply no way to predict what will happen, or when.

On February 17, 2009, Dr. Thompson expressed his opinion that Ms. Johnston was not able to sustain any significant employment at that time due to her symptoms.[25]

On April 16, 2010, Dr. Thompson completed an attending physician's statement for Ms. Johnston's health insurance provider.[26]  There, he noted that she had been diagnosed with dysautonomia and postural orthostatic hypotension since at least 2007.  He stated that she had a positive tilt table test and exhibits all symptoms of dysautonomia.  He described her symptoms as including near syncope within the

---

[25]     Rec. Doc. 4-1 at 192.

[26]     Rec. Doc. 4-1 at 258.

first ten minutes of an autonomic function test, fatigue, heat intolerance, nausea, palpitation, and chest pain.  He stated that she cannot use her arms above her head, cannot be exposed to heat or cold, and cannot lift anything heavier than twenty-five pounds.

On May 4, 2011, Dr. Thompson completed a medical source statement of ability to do work-related activities concerning Ms. Johnston.[27]  He stated that, based upon his medical knowledge, clinical findings, and Ms. Johnston's medical records, she can sit for only thirty minutes at a time without interruption, can stand or walk for only five to ten minutes at a time without interruption, can sit only two hours out of an eight-hour day, and can stand or walk for only one hour out of an eight-hour day.  He noted that she requires the use of a cane to ambulate, needs to elevate her legs intermittently to relieve her symptoms, would need to take hourly breaks during the work day because of pain, fatigue, tremors enhanced by stress, passing out, near-passing out, palpitations, tachycardia, headaches, and nausea.  He also opined that she would likely miss work or need to leave work early at least once a week because of her symptoms.  Dr. Thompson also prescribed a wheelchair for Ms. Johnston.[28]

---

[27]     Rec. Doc. 4-1 at 262-263.

[28]     Rec. Doc. 4-1 at 264.

On July 26, 2010, Ms. Johnston was examined by Dr. Scott C. Chapman at the request of Disability Determination Services. Dr. Chapman's impression is consistent with that of Dr. Thompson. He found that Ms. Johnston has dysautonomia. He stated that "[d]ysautonomia is a fairly poorly understood disease which causes recurring symptoms such as loss of consciousness and extreme fatigue." He also noted that Ms. Johnston takes "multiple medications which have reduced the severity of her symptoms." He also noted that because she experiences sudden and recurring loss of consciousness, Ms. Johnston needs to follow precautions similar to those followed by seizure patients by avoiding any type of high risk environments.

At the hearing on April 28, 2011, Ms. Johnston testified that, in the recent past, she had been fainting approximately twice a week and had passed out the day before.[29] Although she passes out more when she spends more time on her feet,[30] she has passed out while lying down.[31] She described her condition as "scary;"[32] she described her existence as boring for a person her age;[33] and she expressed concern

---

[29]     Rec. Doc. 4-1 at 40.

[30]     Rec. Doc. 4-1 at 40.

[31]     Rec. Doc. 4-1 at 41.

[32]     Rec. Doc. 4-1 at 41.

[33]     Rec. Doc. 4-1 at 40.

about being a burden on her parents.[34]  She testified that she would like to continue her education and pursue employment in a counseling field[35] but she contends that the unpredictability of her disorder[36] has prevented her from doing so.

## ASSIGNMENT OF ERRORS

Ms. Johnston contends that the Commissioner erred in finding her not disabled. More particularly, she contends that the ALJ failed to give controlling weight to the medical opinions of her treating physician, failed to properly weigh her treating physician's medical opinions, and failed to properly apply the controlling legal standards in evaluating her residual functional capacity and credibility.

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to determining whether the decision was supported by substantial evidence and whether the proper legal standards were applied in reaching the decision.[37]  If the Commissioner's

---

[34]     Rec. Doc. 4-1 at 35.

[35]     Rec. Doc. 4-1 at 35-36.

[36]     Rec. Doc. 4-1 at 47.

[37]     *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001); *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).

-8-

findings are supported by substantial evidence, they must be affirmed.[38]  Substantial

evidence is more than a mere scintilla and less than a preponderance.[39]  A finding of

no substantial evidence is appropriate only if no credible evidentiary choices or

medical findings support the decision.[40]   Finding substantial evidence requires

scrutiny of the entire record as a whole.[41]  In applying this standard, the court may not

re-weigh the evidence or substitute its judgment for that of the Commissioner.[42]

A claimant seeking Social Security benefits bears the burden of proving that

he or she is disabled.[43]  Disability is defined in the Social Security regulations as the

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than

---

[38]     *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[39]     *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[40]     *Boyd v. Apfel,* 239 F.3d at 704.

[41]     *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

[42]     *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135.

[43]     *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005); *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992); *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1301 (5th Cir. 1987).

12 months."[44]   Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit.[45]

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  At step one, an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.  At step two, an individual who does not have a severe impairment will not be found disabled.  At step three, an individual who meets or equals an impairment listed in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without consideration of vocational factors.  If an individual is capable of performing the work he has done in the past, a finding of not disabled must be made at step four.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if the claimant can perform any other work at step five.[46]

---

[44]     42 U.S.C. § 423(d)(1)(A).

[45]     20 C.F.R. § 404.1572(a)-(b).

[46]     *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991), summarizing 20 C.F.R. § 404.1520(b)-(f). See, also, *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[47] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the claimant's record.[48]  The claimant's residual functional capacity is used at the fourth step to determine if the claimant can still do his past relevant work, and is used at the fifth step to determine whether the claimant can adjust to any other type of work.[49]

The claimant bears the burden of proof on the first four steps.[50]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[51]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[52]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[47]     20 C.F.R. § 404.1520(a)(4).

[48]     20 C.F.R. § 404.1545(a)(1).

[49]     20 C.F.R. § 404.1520(e).

[50]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[51]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[52]     *Fraga v. Bowen*, 810 F.2d at 1304.

rebut this finding.[53]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[54]

In this case, the Commissioner found, at step one, that Ms. Johnston has not engaged in substantial gainful activity since her application date of May 13, 2010.[55] That finding is supported by evidence in the record.

At step two, the ALJ found that Ms. Johnston has one severe impairment: dysautonomia.[56]  This finding is also supported by evidence in the record.

At step three, the ALJ found that Ms. Johnston does not have an impairment or a combination of impairments that meets or medically equals a listed impairment.[57] Ms. Johnston does not argue that this finding was incorrect.

The ALJ then found that Ms. Johnston retains the residual functional capacity to perform a full range of work at all exertional levels except that she is precluded from working at unprotected heights or around hazardous machinery.[58]  At step four,

---

[53]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[54]     *Anthony v. Sullivan*, 954 F.2d at 293, citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[55]     Rec. Doc. 4-1 at 17.

[56]     Rec. Doc. 4-1 at 17.

[57]     Rec. Doc. 4-1 at 17.

[58]     Rec. Doc. 4-1 at 18.

the ALJ found that Ms. Johnston is capable of performing her last relevant work as a sales clerk.[59]  Ms. Johnston argues that the ALJ improperly evaluated her residual functional capacity and her credibility.   Ms. Johnston also argues that the Commissioner's conclusion that she is not disabled is erroneous.

### DISCUSSION

Ms. Johnston's first argument is that the ALJ failed to give Dr. Thompson's medical opinions controlling weight.  Her second argument is that the ALJ failed to properly weigh Dr. Thompson's opinions.  Her third argument is that the ALJ failed to apply the proper legal standard in evaluating Ms. Johnston's residual functional capacity and credibility.  Because these arguments are so tightly interwoven in this case, they will be considered collectively.

The ALJ has sole responsibility for determining the claimant's disability status.[60]  However, while a treating physician's opinions are not determinative, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining

---

[59]     Rec. Doc. 4-1 at 19.

[60]     *Newton v. Apfel*, 209 F.3d at 455.

disability.[61]  In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[62]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[63]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[64]  Before declining to give any weight to the opinions of a treating doctor, an ALJ must also consider the length of treatment by the physician, the frequency of his examination of the claimant, the nature and extent of the doctor-patient relationship, the support provided by other evidence, the consistency of the treating physician's opinion with the record, and the treating doctor's area of specialization, if any.[65]  In this case, the ALJ made no such

---

[61]     *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

[62]     20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d at 393.

[63]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

[64]     *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

[65]     *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d at 456.

evaluation.  Consequently, the undersigned finds that the ALJ improperly discounted Dr. Thompson's opinions.

Dr. Thompson has treated Ms. Johnston since March 2007, and has seen her at least seven times.  A physician qualifies as a treating source if the claimant sees the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the claimant's medical conditions.[66]  In this case, Ms. Johnston saw Dr. Thompson, who is located in Pensacola, Florida, more frequently when she lived in Alabama and less frequently after she moved to Louisiana.  Her scheduling of appointments with Dr. Thompson has also been complicated by the fact that Dr. Thompson, like Ms. Johnston, suffers with dysautonomia and was having health problems that prevented him from keeping his appointment with her in 2010.  Ms. Johnston testified at the hearing that it was only upon arriving in Florida for her appointment that she learned Dr. Thompson had undergone heart surgery and would be unable to see her.  Thereafter, however, she again saw Dr. Thompson in 2011.  Ms. Johnston has been looking for a treating physician in a nearer locality but dysautonomia is such an uncommon disorder that she has had difficulty finding another doctor.  Ms. Johnston testified that even the

---

[66]     *Huet v. Astrue*, 375 Fed. App'x 373, 376 (5th Cir. 2010), citing 20 C.F.R. § 404.1502.

neurologist who diagnosed her condition declined to treat her because he was not sufficiently familiar with the disorder.[67]

The ALJ clearly did not believe that Ms. Johnston visited Dr. Thompson frequently enough. He stated that he "cannot ignore the fact that claimant seeks very little, if any, medical treatment for her allegedly disabling impairments."[68] He also noted that "[t]he claimant testified that she started seeing Dr. Thompson in 2006 and saw him every six months. However, when she last saw Dr. Thompson in October of 2009, she had not seen him since March of 2008."[69] But there is no indication in the record that this illness requires a patient to see a doctor more frequently than Ms. Johnston sees Dr. Thompson. The ALJ's comments also ignore Ms. Johnston's testimony that the rarity of her disorder is making it difficult for her to find appropriate medical care in her new home town as well as her testimony that she missed an appointment with Dr. Thompson due to his own medical problems. The undersigned finds that Dr. Thompson is Ms. Johnston's treating physician.

Because Dr. Thompson is Ms. Johnston's treating physician, the ALJ should have accorded Dr. Thompson's opinions great weight or set forth good cause for not

---

[67]     Rec. Doc. 4-1 at 36.

[68]     Rec. Doc. 4-1 at 19.

[69]     Rec. Doc. 4-1 at 19.

doing so.  In this case, Dr. Thompson opined that Ms. Johnston can sit for only thirty minutes at a time, can stand or walk for only five to ten minutes at a time, can sit for only two hours out of an entire work day, and can stand or walk for only one hour out of an entire work day.[70]  But the ALJ found that Ms. Johnston has the residual functional capacity to perform a full range of work at all exertional levels with the exception that she is precluded from working at unprotected heights and around hazardous machinery.  This finding is incompatible with Dr. Thompson's opinions.  The ALJ further found that Ms. Johnston is capable of returning to her prior work as a sales clerk.[71]  Such work would require significantly more standing and walking than Dr. Thompson recommended.  Thus, the ALJ gave Dr. Thompson's opinions no weight at all.  Moreover, the ALJ did not explain his basis for disregarding Dr. Thompson's opinions or state good cause for doing so.

Instead, the ALJ seems to have cherry-picked information from the record with which to support his own determination of Ms. Johnston's capabilities and to discredit her.  He noted that even though her dysautonomia causes her to pass out, she drives, ignoring her testimony that she rarely drives and can usually predict when she will be likely to lose consciousness.  He noted that even though she has shortness of

---

[70]     Rec. Doc. 4-1 at 262.

[71]     Rec. Doc. 4-1 at 19-20.

breath, she smokes, ignoring her testimony regarding how much and how often she smokes.  He noted that she visits with friends, occasionally goes to movies or to eat out, and watches movies on her computer, ignoring her testimony that she sees friends about once a month and is usually too fatigued to get out of bed.  The law is clear that "[t]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."[72]  Furthermore, it is improper for an ALJ to rely upon his own unsupported opinion as to the limitations presented by the applicant's medical conditions.[73]

    In responding to Ms. Johnston's appeal, the Commissioner focused in part on Dr. Chapman's statement that her medications have reduced the severity of her symptoms.  But there is no evidence that the medications prescribed by Dr. Thompson have sufficiently improved Ms. Johnston's condition to the point that it is not disabling.  "If an impairment reasonably can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability."[74]  However, in this case, it cannot be said that a reduction in severity of symptoms is the same as control or remedy of Ms. Johnston's dysautonomia given her testimony and that of her

---

[72]     *Loza v. Apfel*, 219 F.3d at 393.

[73]     *Williams v. Astrue*, 355 Fed. App'x 828, 832 n. 6 (5th Cir. 2009).

[74]     *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

mother at the hearing concerning her continued symptoms and their effect on her daily life.

Most important, there is no evidence in the record that contradicts Dr. Thompson's findings or his opinions. Like Dr. Thompson, Dr. Chapman found that Ms. Johnston suffers with dysautonomia. Unlike Dr. Thompson, however, Dr. Chapman did not evaluate Ms. Johnston's functional capacity except to advise that she avoid any type of high risk environment due to the sudden and recurring loss of consciousness. Although an orthopedic range of motion analysis is attached to Dr. Chapman's report, it is unclear what significance such an evaluation has with regard to a patient with Ms. Johnston's disorder.

Dr. Thompson's opinions are not conclusory, they are not unsupported by medically acceptable clinical laboratory diagnostic techniques, and they are not otherwise unsupported by the evidence. Accordingly, the undersigned finds that the ALJ failed to show good cause for discounting Dr. Thompson's opinions and, for that reason, failed to apply the proper legal standard when deciding to reject the opinions of Ms. Johnston's treating physician. The undersigned recommends that this matter be remanded so that the proper weight may be given to Dr. Thompson's opinions and so that Ms. Johnston's residual functional capacity can be reevaluated.

## CONCLUSION AND RECOMMENDATION

For the reasons explained above, the undersigned finds that the Commissioner's ruling that Ms. Johnston is not disabled is not supported by substantial evidence and was reached by the application of improper legal standards. Accordingly,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be REVERSED and REMANDED for further consideration in accordance with the foregoing discussion.  In particular, the Commissioner should (1) afford Ms. Johnston an opportunity to update the record by submitting her medical records for the time period from the date of the last hearing forward; (2) afford Ms. Johnston another hearing; (3) either give controlling weight to the opinions of Ms. Johnston's treating physician(s) or set forth good cause for not doing so; (4) thoroughly evaluate Ms. Johnston's residual functional capacity, (5) reconsider the finding that Ms. Johnston can perform her prior work, and (6) determine whether Ms. Johnston is disabled.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 13th day of November 2013.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE